UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br>v.<br><br>ANDREW CHMIEL, et al.,<br><br>         Defendants. | Criminal Action No. 3:19-cr-00299-JFA<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT CHMIEL'S MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)** |

  Defendant Andrew Chmiel ("Chmiel"), by and through his undersigned counsel, submits this Memorandum in Support of his Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A).

**<u>BACKGROUND</u>**

  1. On April 12, 2021, pursuant to a written plea agreement with the Government, the Chmiel pled guilty to a one-count Information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. On March 19, 2024, Chmiel was sentenced to a term of 108 months. Currently, Mr. Chmiel is scheduled to report to FCI Berkley SCP no later than June 20, 2024.

  2. Mr. Chmiel does not make this request lightly. Rather, he recognizes the magnitude of the relief he seeks and regrets that the matter did not arise sooner. But what seemed to be a significant but well-controlled medical condition at the time the *Presentence Report* was prepared and the sentencing was conducted has collided with the Federal Bureau of Prisons medical care system and its rigid *National Formulary* to produce a serious health-threatening situation for Mr. Chmiel.

*Exhaustion*

3.     Mr. Chmiel has written to the Warden of FCI Beckley, the institution to which he has been designated, asking that the Director of the Bureau of Prisons file a motion for sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A) on his behalf.  *See* Chmiel letter, attached as Exhibit 1.  As of the date of this Motion, he has received no response.

*Facts Relating to Medical Condition:*

4.     In his Presentence Report, Mr. Chmiel recounted to the Probation Officer that "he suffers from degenerative arthritis and hypertension, and he takes prescription medications to treat these conditions. Chmiel reported no further physical health conditions or problems." *Id.* at ¶ 78. He said no more because he was receiving treatment for his conditions and his symptoms were under control.

5.     In April 2015, Mr. Chmiel tested positive for HLA-B27 which is a gene variant on chromosome 6. (*See Test Results attached as* Exhibit 2) Patients who are positive for HLA-B27 have a risk of developing autoimmune disorders where the immune systems mistakenly attack healthy body tissue which is where the irreversible disfigurement comes into play when not treated properly. Mr. Chmiel's status as positive for HLA-B27 led to his degenerative arthritis. This degenerative arthritis is a rare type of arthritis known as "ankylosing spondylitis," or "AS." AS is an inflammatory disease that, over time, can cause the vertebrae to fuse, making the spine less flexible and resulting a hunched posture. If ribs are affected, it can be difficult to breathe deeply.[1] AS also affects peripheral joints like the knees, ankles, and hips.[2] Sometimes the eyes can become

---

[1] *Ankylosing Spondylitis* (MAYO CLINIC, Dec. 21, 2023), found at https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808 (last accessed June 10, 2024).

[2] *Ankylosing Spondylitis* (NATIONAL INSTITUTE OF ARTHRITIS, MUSCULOSKELETAL AND SKIN DISEASES, March 2023), found at https://www.niams.nih.gov/health-topics/ankylosing-spondylitis (last accessed June 10, 2024).

involved (known as iritis or uveitis), and — rarely — the lungs and heart can be affected.[3] In more advanced AS cases, the inflammation caused by the disease can lead to ankylosis — new bone formation in the spine — causing sections of the spine to fuse in a fixed, immobile position. The hallmark feature of ankylosing spondylitis is the involvement of the sacroiliac (SI) joints — located at the base of the spine, where the spine joins the pelvis — during the progression of the disease. *Id.*

6. Mr. Chmiel has been able to fully control his AS through the use of Etanercept, a drug marketed under the trade name Enbrel. This drug is a biologic medical product that is used to treat autoimmune diseases, including AS, by interfering with tumor necrosis factor (TNF), a soluble inflammatory cytokine, by acting as a TNF inhibitor. The drug has Food and Drug Administration approval to treat rheumatoid arthritis, juvenile idiopathic arthritis and psoriatic arthritis, plaque psoriasis and ankylosing spondylitis. Tumor necrosis factor alpha (TNFα) is the "master regulator" of the inflammatory (immune) response in many organ systems. Autoimmune diseases are caused by an overactive immune response. Etanercept has the potential to treat these diseases by inhibiting TNF-alpha.[4]

7. Mr. Chmiel suffers from a severe form of AS. He has been a patient in the Medical University of South Carolina system since 2013 and was diagnosed with ankylosing spondylitis two years later. Dr. Grace Suppa, his Rheumatologist, reports that "[u]ntreated ankylosing spondylitis can result in progressive permanent structural damage and fusion of the spine, shoulders, hip and neck. This can lead to a loss of spinal flexibility and chronic pain, as well as

---

[3] *Overview of Ankylosing Spondylitis* (SPONDYLITIS ASS'N OF AMERICA, 2023), found at https://spondylitis.org/about-spondylitis/overview-of-spondyloarthritis/ankylosing-spondylitis/ (last accessed June 10, 2024).

[4] Feldmann M, Maini RN, *TNF defined as a therapeutic target for rheumatoid arthritis and other autoimmune diseases* (NATURE MEDICINE, Vol. 9, No. 10 pp.1245–1250), found at https://www.nature.com/articles/nm939 (last accessed June 10, 2024).

decreased lung capacity. All of these structural damages are permanent, irreversible, unrepairable, debilitating, and disfigurement." See *Letter from Grace Suppa, D.O.,* attached as Exhibit 3.

8. Dr. Suppa warns that Mr. Chmiel's:

"joints will fuse together if he does not maintain the medical regimen that has been prescribed by my office. He already has had one total hip replacement because of the effects of his ankylosing spondylitis. Andrew currently receives etanercept (Enbrel®) (50 mg) in a weekly injection. Enbrel is an anti-inflammatory Tumor Necrosis Factor (TNF) inhibiting agent… Enbrel, like most anti-inflammatory TNF inhibitors, provides relief gradually. Studies show that 60% of patients reported improvement after 12 weeks of treatment. In April 2021, he had been prescribed adalimumab (Humira®). Tests for adalimumab concentration and the presence of anti-adalimumab antibodies at the time showed concentrations of adalimumab in the 1.7 mcg/ml range, about 20% of the bottom of the normal range (8-12 mcg/ml) expected in a patient. (*See Test Results attached as* Exhibit 4.) Because of the abnormal results of the test, an additional adalimumab ab serum test was conducted. His results were 18 times the high end of the normal range. (*See Test Results attached as* Exhibit 5.) These results showed that the medication was ineffective and should not be substituted for Enbrel. If Enbrel is denied to Andrew for a period of time when he reports to begin serving his sentence - even for a period of four weeks or so - there a reasonable likelihood that he will suffer permanent unrepairable joint damage and or crippling irreversible deformity. *Id.*

9. Even with Enbrel, Mr. Chmiel's AS leaves him in constant pain, which he describes as being as if "someone's got a grip on my spine from inside or like a high collar shirt and tie that's too tight. I really don't notice how badly the pain really affects me until I have a pain-free day. I then realize how bad it really is." He states that "if I'm late on an Enbrel shot or miss it, I notice it within a day when my pain level doubles and I stiffen. It is very noticeable in my neck, knuckles and back." *Declaration of Andrew Chmiel,* attached as Exhibit 6**.**

10. The Federal Bureau of Prisons will not permit Mr. Chmiel to arrive at FCI Beckley with any of his prescription medications, including Enbrel. Instead, all prescription[5] medicines

---

[5] Bureau of Prisons P.S. 6360.02, *Pharmacy Services* (October 24, 2022), § 8(d), found at: https://www.bop.gov/policy/progstat/6360_002.pdf (last accessed June 10, 2024)
Bureau of Prisons P.S. 6541.03,   *Over-The-Counter Medications* (November 17, 2004) at §1, found at: https://www.bop.gov/policy/progstat/6541_002.pdf  (last accessed June 10, 2024).

4

must be distributed by the BOP, and all non-prescription medicine can only be obtained from Health Services or, in some cases, purchased from the institution commissary. The BOP maintains a *National Formulary*[6] which prescribes "a list of medications that are considered by the organization's professional staff to ensure high quality, cost-effective drug therapy for the population served. Participants of the Pharmacy, Therapeutics and Formulary Meeting are responsible for the development, maintenance and approval recommendations of the formulary to the BOP Medical Director. Periodically, medications are reassessed and extensively reviewed for inclusion, exclusion, or restrictions in the formulary as applicable per current evidence-based practices and security concerns." *National Formulary Procedural Statement.*[7]

11. The *National Formulary* does not approve the use of Enbrel for any purpose until adalimumab (Humira) is tried and fails "due to better side effect profile and cost effectiveness" or until an "adequate trial of [a] maximally dosed/tolerated methotrexate/prednisone or other formulary non-biologic DMARD (disease-modifying anti-rheumatoid drug)" fails or where there are "intolerable side effects of methotrexate where a TNF agent may allow a decrease in methotrexate dose." All new and renewal prescriptions require "consultation with an appropriate specialist based on the disease state being treated (for example, dermatologist, gastroenterologist, or rheumatologist)." *Id.*

---

[6] Formularies define "both which drugs are covered by an insurer or health plan, and the scope or restrictions for such coverage. And they typically contain multiple tiers of coverage, which determine the amount of a patient's copay or conditions that must be met to obtain coverage. In effect, these tiers can favor some drugs over others. *In re EpiPen Direct Purchaser Litigation*, Case No. 20-cv-0827 (D. Minn. Jan. 15, 2021) (ECT/TNL), 2021 U.S. Dist. LEXIS 8362, at *5 (cleaned up).

[7] *BOP National Formulary* (May 2, 2022), p. 4, found at:
 https://www.bop.gov/resources/pdfs/2022_winter_formulary_part_1.pdf (last accessed June 10, 2024).

5

12. While plaque psoriasis and a number of other disorders are mentioned in the national formulary, AS is nowhere referenced.

13. In other words, Mr. Chmiel will have to undergo experimentation by BOP medical staff for a period of uncertain duration, receiving adalimumab (Humira) despite the fact that his treating rheumatologist has already determined that it is "ineffective and should not be substituted for Enbrel." *See* Exhibit 3. The specialist best conversant with Mr. Chmiel's condition believes that "[i]f Enbrel is denied to Andrew for a period of time when he reports to begin serving his sentence - even for a period of four weeks or so - there a reasonable likelihood that he will suffer permanent unrepairable joint damage and or crippling irreversible deformity."

14. Unfortunately, Mr. Chmiel will undoubtedly wait much longer than four weeks just to consult with a specialist, required before he will get any TNF medicine at all, let alone Enbrel. Trips away from the facility require escorts, and the BOP's severe staff shortage—well documented in the national media—delays such consultations.[8] In a recent report on an inspection of FCI Sheridan, Oregon, the Dept. of Justice Inspector General found:

> Delayed medical treatment can lead to more serious medical conditions for an inmate, as well as substantially increased costs for the institution. For example, we found that, just prior to our inspection, an inmate feigned a suicide attempt in order to receive medical attention for an untreated ingrown hair that had become infected. When finally examined after the feigned suicide attempt, he required hospitalization for 5 days to treat the infection. Separately, while not directly related

---

[8] *See, e.g.,* Thrush, Glenn, *Staffing Crisis at Federal Prisons Highlighted in Oregon* (THE NEW YORK TIMES, May 22, 2024), found at https://www.nytimes.com/2024/05/22/us/politics/oregon-prison-staffing-shortage.html (last accessed June 10, 2024) ("The work force shortages at the prison, Federal Correctional Institution, Sheridan, reflect a broader staffing crisis at dozens of facilities run by the Bureau of Prisons, according to a report released Wednesday by Michael E. Horowitz, inspector general of the Justice Department. It has spurred long waiting lists for essential medical and dental services, mental health care and drug treatment at Sheridan, mirroring similar problems at federal facilities across the country);

*See also* Friedman, Drew, *New 25% retention bonuses at Bureau of Prisons only a 'Band-Aid' for larger staffing issues* (Federal News Network, Oct. 4, 2023), found at https://federalnewsnetwork.com/pay/2023/10/new-25-retention-bonuses-at-bureau-of-prisons-only-a-band-aid-for-larger-staffing-issues/#:~:text=In%20the%20last%20seven%20years,for%20both%20staff%20and%20inmates (last accessed June 10, 2024) ("In the last seven years, BOP staffing levels have dropped more than 20%, bottoming out at a current 40% shortage of correctional officers, according to AFGE").

>to staff shortages, we also observed a variety of potentially dangerous medication distribution practices.
>
>We also found that, due to substantial staff shortages, FCI Sheridan did not always have available Correctional Officers to escort inmates to external medical providers. At the time of our inspection,101 outside appointments had been canceled between January and November 2023 due to the lack of available employees to escort inmates to these appointments. We note that, after receiving a draft of the report, the BOP reported that 89 of the 101 consultations had been completed since our inspection.[9]

The Inspector General noted that many of the issues it identified at FCI Sheridan "were consistent with BOP-wide issues on which we have made recommendations in prior work." *Id.* An inspection of FCI Tallahassee reported on last November "found that staff shortages have negatively affected healthcare treatment" and "the BOP has difficulty hiring healthcare professionals across its institutions. As of May 2023, FCI Tallahassee's Health Services Department was 62 percent staffed (13 out of 21 positions filled) with longstanding vacancies in registered nurse and mid-level provider positions..."[10]

15.     Delays in getting outside consultation is not the only failing of BOP medical care. A February 2024 Dept. of Justice Office of Inspector General report found medical response deficient in almost half of all federal inmate deaths studied, ranging from lackluster response to inadequate equipment to lack of emergency skills.[11]

---

[9] Dept. of Justice Office of Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan* (Report No. 24-070, May 22, 2024) at pp. 1-2, found at: https://oig.justice.gov/sites/default/files/reports/24-070_0.pdf (last accessed June 10, 2024).

This is nothing new. In March 2022, the Dept. of Justice Office of Inspector General found in *Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School* (Report No. 22-052) at p. 13 that "the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare."

[10] Dept. of Justice Office of Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee* (Report No. 24-005, November 17, 2023) at p.35, found at https://oig.justice.gov/sites/default/files/reports/24-005.pdf (last accessed June 10, 2024).

[11] Dept. of Justice Office of Inspector General, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* (Report No. 24-041, February 15, 2024) at pp. 33-34, found at https://oig.justice.gov/sites/default/files/reports/24-005.pdf (last accessed June 10, 2024).

7

16.     The foregoing studies are fully supported by anecdotal and horrific reports of BOP medicine. In a case out of the Eastern District of New York, the court granted compassionate release to a man convicted of attempted murder in a mob-related failed killing where he was losing his vision and the BOP had done little about it:

> Mr. DeMartino's circumstances are made all the more extraordinary and compelling by the BOP's lack of responsiveness and candor with respect to his medical conditions. The BOP has long been on notice that Mr. DeMartino's ocular conditions need careful monitoring: his 2004 Presentence Report determined that he "need[ ed] to be seen by an ophthalmologist at least once per month." PSR 187. I reiterated this need just last year, when I issued an Order noting an expectation that "Mr. DeMartino [would] continue to receive prompt and adequate vision care while in BOP custody" because, at the time, Mr. DeMartino had "finally [been] able to see the [vision] specialist whose consult he had been seeking for some time." ECF No. 255 at 1.
>
> Despite this notice, the record reflects a consistent pattern on the part of the BOP of downplaying Mr. DeMartino's conditions and delaying treatment. Despite the severity of his ocular conditions, it has been a herculean task for Mr. DeMartino to see an ophthalmologist. In a series of messages from Mr. DeMartino to FCC Hazelton staff beginning on October 21, 2021[,] and continuing through December 29, 2021, he requested, with increasing desperation, help with right eye blindness and confirmation of a follow-up operation that was previously directed by a doctor. See ECF No. 256-1. He was not seen by an ophthalmologist until March 7, 2022 when he was taken to the emergency room and ophthalmology was consulted. ECF No. 261. Until the Court addressed the issue at a May 4th conference, the only prearranged ophthalmology appointment that occurred during the more than six months of Mr. DeMartino's vision crisis was on March 30, 2022. After the Court advised at the May 4th conference that Mr. DeMartino's retinal issues appeared to require "immediate appropriate care," the government informed the Court that Mr. DeMartino was scheduled to have an appointment with an outside ophthalmologist on May 16, 2022. This appointment did not occur for an "unknown reason." Email from Oren Gleich, AUSA, to Court (May 24, 2022 4:16 EST). At the eleventh hour, the Court was informed that the appointment eventually did go forward, albeit nine days after it was scheduled.

*Order, United States v. DeMartino*, Case No 1:03cr265 (E.D.N.Y., May 26, 2022).[12]

---

[12] Found at https://lisa-legalinfo.com/wp-content/uploads/2022/06/Demartino220603.pdf (last accessed June 10, 2024).

17. Finally, the BOP repeatedly delayed recommended treatment for an inmate's breast cancer for 17 months, nevertheless contending to the court that "the Bureau is currently providing inmate Beck with appropriate medical care for her breast cancer." The court granted compassionate release, holding that "the quality of treatment BoP has provided Ms. Beck for her cancer has been abysmal. *See, e.g.*, Civil Doc. 16 at pp. 3-6, ¶¶ 2-8; Civil Doc. 3-1 at ¶ 24 ('[T]he . . . course of action by the prison system in responding to Ms. Beck's known breast cancer, punctuated by repeated delays in care, was grossly inadequate . . . [and] there is no medical justification'). BoP has not acknowledged deficiencies in Ms. Beck's medical care… which indicates BoP is unlikely to meet its constitutional obligations in the future. As long as she stays in BoP custody, she faces a substantial likelihood of substandard medical care for her life-threatening disease." *United States v. Beck*, 425 F. Supp. 3d 573, 581 (M.D.N.C. 2019).

### *Law of Compassionate Release*

18. A court may not modify a term of imprisonment once it has been imposed except that under 18 U.S.C. § 3582(c)(1), it may do so in a case where:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that—
>
>> (i) extraordinary and compelling reasons warrant such a reduction…
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Congress enacted Section 3582(c)(1)(A) as part of the *Sentencing Reform Act of 1984,* Pub.L. 98-473, 98 Stat. 1998-99 (October 12, 1984), it directed the United States Sentencing Commission to

adopt a policy statement to guide a district court's discretion in determining when "extraordinary and compelling reasons" exist to grant a reduction in sentence. *Mohrbacher v. Ponce*, Case No. 18-cr-00513 (C.D.Cal., July 26, 2018) 2018 U.S. Dist. LEXIS 218929, *18. In response, the Commission promulgated U.S.S.G. §1B1.13, which provides in relevant part that "the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that:

    (1) extraordinary and compelling reasons warrant the reduction...[;]
    (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
    (3) the reduction is consistent with this policy statement.

Section 603(b) of the *First Step Act*, Pub.L. 115-391, Title VI, 132 Stat. 5194, 5239 (Dec. 21, 2018), stripped the BOP of its exclusive right to bring § 3582(c)(1)(A) motions.

    19.    USSG §1B1.13 provides the following:

(b) EXTRAORDINARY AND COMPELLING REASONS. — Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

    (1)  Medical Circumstances of the Defendant.—

                  *     *     *

        (B) The defendant is—

           (i.) suffering from a serious physical or medical condition,
           (ii.) suffering from a serious functional or cognitive impairment, or
           (iii.) experiencing deteriorating physical or mental health because of the aging process,

              that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

* * *

(5) OTHER REASONS.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4). *Id.*

20. This Circuit joined many others in holding that after the *First Step Act* passed, Guideline § 1B1.13 – which had remained unamended since prior to the new law until November 2023 – was not binding where a prisoner has brought a § 3582(c)(1)(A)(i) motion. *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020). When the revised § 1B1.13 became effective on November 1, 2023, the question of whether § 1B1.13 binds district courts was mooted: 18 U.S.C § 3582(c)(1)(A)(i) requires it. As such, it is now an "applicable" policy statement. *United States v. Brown*, Case No. JKB-08-00415 (D. Md. Dec. 13, 2023), 2023 U.S. Dist. LEXIS 223262, at *4; *United States v. Smith*, Case No. JKB-12-479 (D. Md. Feb. 21, 2024), 2024 U.S. Dist. LEXIS 30932, at *4.

21. As for procedure, the 6th Circuit in *United States v. Jones,* 980 F.3d 1098, 2107 (2020) observed that "compassionate release hearings are sentence-modification proceedings and that courts considering motions filed under § 3582(c)(1) must follow a *Dillon*-style test." *Jones, supra* at 980 F.3d 1107, citing *Dillon v. United States*, 560 U.S. 817, 829-30 (2010). *Dillon* reasoned that "requir[ing] courts to treat the [Sentencing] Guidelines differently in similar proceedings lead[s] potentially to unfair results and considerable administrative challenges"). *Id.*

22. *Jones* defined a three-step § 3582(c)(1)(A) test as follows:

Step One: a court must determine whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i);

11

> Step Two: a court must determine whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A); and
>
> Step Three: a court must "consider" any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." *Dillon, supra* at 560 U.S. 837.

*Jones, supra.* [13] In *United States v. Concepcion*, --- U.S. ---, 142 S. Ct. 2389, 213 L. Ed. 2d 731 (2022), the Supreme Court undertook a broad and expansive view of sentencing discretion, *id.* at 142 S. Ct. 2398-2401, holding that the only limitations on a court's discretion to consider any relevant materials at an initial sentencing or in modifying that sentence are those set forth by Congress in a statute or by the Constitution." *Id.* at 142 S. Ct. 2400. That "venerable tradition of discretion" applies in full to both "initial sentencings and sentence modification proceedings." *Id.* at 142 S. Ct. 2401, n.4.

## ARGUMENT

### I. Exhaustion of Remedies

23. On April 26, 2024, Mr. Chmiel asked the warden of FCI Beckley—the facility to which the BOP has designated him—to have the BOP bring a motion for sentence reduction on his behalf. See letter, attached as Exhibit 1. The warden has not replied.

---

[13] Although U.S.S.G. §1B1.13 is applicable, that policy statement directed that the district court exercise its *de novo* judgment on the motion:

> The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community.

*Id.* at comment. (p.s.), n.4. In the wake of *Jones,* it is clear that a § 3582(c)(1)(A)(i) motion should be granted where a defendant shows the existence of extraordinary and compelling reasons for a sentence reduction, and that grant of the sentence reduction would be consistent with the sentencing factors of 18 U.S.C. § 3553(a).

24.     This Motion is filed pursuant to 18 U.S.C. § 3582(c)(1)(A). That statute provides that a defendant may petition the Court for a sentence reduction but only after he has "fully exhausted all administrative rights to appeal a failure" of the BOP to bring a motion on his behalf or after thirty days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."18 U.S.C. § 3582(c)(1)(A). The exhaustion requirement is mandatory when properly invoked. *United States v. Alam*, 960 F.3d 831, 834 (6th Cir. 2020) quoting *Hamer v. Neighborhood Housing Services of Chicago*, U.S. 138 S. Ct. 13, 17 (2017).

25.     Mr. Chmiel has exhausted his administrative remedies in this case. His request to the warden has gone unanswered for more than 30 days.

## II.     Extraordinary and Compelling Reason

26.     Subsection (b)(1)(B) of USSG § 1B1.13 holds that "extraordinary and compelling reasons" for grant of a sentence reduction include situations where the defendant is "suffering from a serious physical or medical condition… that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  In the alternative, the Guideline covers a situation in which a "defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." USSG § 1B1.13(b)(1)(B) & (C).

27.     Dr. Suppa states that if "Enbrel is denied to [Mr. Chmiel] for a period of time when he reports to begin serving his sentence - even for a period of four weeks or so - there a reasonable likelihood that he will suffer permanent unrepairable joint damage and or crippling irreversible deformity." There can hardly be a more opinion than this, especially where the BOP's own Formulary requires prior consultation with a rheumatologist of its choosing and a test period with

13

several other medications that the rheumatologist already familiar with Mr. Chmiel's condition has stated are ineffective.

28. Even if the BOP could be relied upon to schedule a prompt consultation with a rheumatologist, it is abundantly clear that Mr. Chmiel will go for weeks if not months without the only medication that effectively holds the ravages of AS at bay. There is no question that this situation fits squarely within the "extraordinary and compelling" reason set out in USSG § 1B1.13(b)(1)(B) & (C).

### III. Section 3553(a) Factors

29. As the third step in deciding an 18 U.S.C. § 3553(a) motion, the Court is required to "consider[]" the 18 U.S.C. § 3553(a) sentencing factors." Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed —

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.*

It is noteworthy to observe that the court is to "consider" the factors: the statute provides no command as to how those factors must be applied.

30. The nature of the offense is a central factor in a § 3553(a) assessment, but so are the history and characteristics of the offender. A court considering compassionate release should not focus on the offense to the exclusion of what has happened since that time. As Chief Judge

14

Roger L. Gregory persuasively stated in *United States v. Kibble,* 992 F.3d 326 (4th Cir. 2021) at 992 F.3d 335 (Gregory, C.J., concurring)[14]:

> The text of § 3553(a) does not make any factor, or combination of factors, dispositive… I disagree with the Government's suggestion that a district court may fulfill its duty to reconsider the § 3553(a) factors by merely recounting the considerations that supported the original sentence. Section 3582(c)(1) necessarily envisions that the § 3553(a) factors may balance differently upon a motion for compassionate release than they did at the initial sentencing. An individual requesting compassionate release will, in all cases, be serving a sentence that a district court once held was "sufficient but not greater than necessary." If a district court's original § 3553(a) analysis could always prove that a sentence reduction would intolerably undermine the § 3553(a) factors, then 18 U.S.C. § 3582(c)(1) would, in effect, be a nullity.

*Id.* Rather, the issue should be to assess whether "the defendant's circumstances are so changed… that it would be inequitable to continue the confinement of the prisoner." *Ebbers*, *supra.* A court must "determine what weight, if any, to give these considerations in evaluating whether they outweigh the Section 3553 factors supporting Defendant's sentence." *United States v. Cleveland*, Case No. 12-CR-6109 (W.D.N.Y. Sep. 23, 2020), 2020 U.S. Dist. LEXIS 174932, at *3, citing *Ebbers, supra.*

31.  The Court is aware of Mr. Chmiel's offense, just as it is that the offense was an aberration. He has not tried to excuse his misconduct. He told the Court prior to sentencing that:

> I am ashamed, embarrassed and sincerely remorseful for breaking the law. I take full responsibility for my poor choices. I cannot begin to express the guilt I feel that I may not be able to be around for my children. I am deeply disappointed in myself for placing my family in this nightmare situation. I have caused embarrassment to my wife and children. We have lost friends and no longer attend most social events. We can no longer attend our church services without whispers and looks, which should be a safe space for any family.
>
> I not only hurt my family, but I also hurt the people who depend on Medicare. I hurt the veterans who bravely served our country and the ones who made the ultimate sacrifice like my father. I also hurt the hardworking taxpayers of this country. I failed to follow my moral compass. I let greed get the best of me, and I now risk

---

[14] This is now the majority view in this Circuit. *See United States v. Brown*, 78 F.4th 122, 132 (4th Cir. 2023).

>losing everything I love. I betrayed everyone's trust, and I will work every day for the rest of my life to earn it back.

PSR at ¶ 52.  He continues to stand by that. *See Declaration,* attached as <u>Exhibit 6</u>.

32.  On a 108-month sentence of incarceration, Mr. Chmiel will earn 16 months of good conduct time under 18 U.S.C. § 3624(b). He is eligible to earn and undoubtedly will earn an additional 12 months deducted from his sentence due to credits earned for successful program completion under the *First Step Act*. *See* 18 U.S.C. §§ 3624(g)(3) and 3632(d)(4)(C). Beyond that, he will earn 12 months deducted from his sentence for successful completion of RDAP under 18 U.S.C. § 3621(e)(2)(B) and earn entitlement to 20 months of home confinement for credits earned under 18 U.S.C. § 3632(d)(4)(C). *See* 18 U.S.C. §§ 3624(g)(1)(D)(2). Finally, he will be entitled to 6 months of home confinement at the end of his sentence under 18 U.S.C. § 3624(c)(2). Thus, Mr. Chmiel's time in prison will probably equal about 40 months, with the remaining months credited to good conduct time, FSA credit time, RDAP credit, and pre-release home confinement under §§ 3624(c)(2) and (g)(3). Thus, for the purposes of whether a 108-month period of home confinement constitutes just punishment, that term should not be weighed against 108 months of imprisonment, but rather about 40 months of actual imprisonment, about 26 months of home confinement, and about 36 months of incarceration time forgiven by statute.

33.  No reasonable member of the public will conclude that because Mr. Chmiel was permitted home confinement so that he could continue to receive, at his expense, health-saving medication therapy, somehow confers a benefit on him that promoted disrespect for the law. One would be challenged to find any defendant who would wish that he suffered from a progressive disease for which there is no cure such as AS.

34.  This court has already concluded that Mr. Chmiel represents no danger to the public, nor must the public be protected from him. He made a terrible error in judgment, exhibited

16

a serious moral failing, when he decided to defraud Medicare. He rationalized away the wrongfulness of what he did. It is an offense that has marred his life, destroyed his reputation and dignity, and harmed his family, his community and his country.

35. Mr. Chmiel is asking that the Court resentence him to time served, with an expansion of supervised release equal to his statutory sentence to end June 19, 2033 (to be followed by the already-imposed term supervised release term of 36 months). The supervised release would include all of the conditions specified in the *Judgment*. *See, e.g., United States v. Cantu*, 423 F. Supp. 3d 345, 354-55 (S.D. Tex. 2019) (granting a defendant sentence reduction while imposing home confinement on supervised release "adequately expresses the seriousness of the offense, deters criminal conduct, and protects the public").

36. Courts have acknowledged that release to home incarceration can "reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the defendant's crimes." *United States v. White*, Case No. 2:17-cr-00198-4 (S.D.W.Va. June 12, 2020), 2020 U.S. Dist. LEXIS 103974, at *16 *citing United States v. Campagna*, Case No. 16cr78-01 (S.D.N.Y. Mar. 27, 2020), 2020 U.S. Dist. LEXIS 54401, at *1, 9). One court observed that "[i]n some respects, home confinement will result in less freedom of movement than [the defendant] would have in a prison environment that offers large recreational areas and educational opportunities." *United States v. Young*, Case No. CR19-5055 (W.D. Wash. May 22, 2020), 2020 U.S. Dist. LEXIS 90537, at *11. *See also United States v. Springer*, Case No. 20-5000 (10th Cir. July 15, 2020), 2020 U.S. App. LEXIS 21947, at *3-4 (defendant's "transfer to home confinement is not a release from imprisonment, nor does this transfer reduce the length of his custodial sentence… [E]ven though a prisoner is… in home confinement, he is still serving a 'term of imprisonment.' When read together, [18 U.S.C. §§ 3621 and 3624(c)] plainly indicate that a person

17

is in the BOP's 'custody' while serving the remainder of a sentence in home confinement" (internal citation omitted)). *See also Melot v. Bergami*, 970 F.3d 596, 599 and n.13 (5th Cir. 2020) (placement of a prisoner by BOP in home confinement under 34 U.S.C. § 60541(g) "elderly offender home detention program" is a "change in confinement from a prison facility to home detention" and is properly considered to be a change in "conditions of confinement" that cannot be challenged in a 28 U.S.C. § 2241, a conclusion that is "consistent with 18 U.S.C. § 3621, which gives the BOP the authority and discretion to designate the place of a convicted offender's confinement").

## CONCLUSION

37.     The need for a sentence reduction in this case is extraordinary and compelling within the meaning of 18 U.S.C. § 3582(c)(1)(A)(i) and USSG § 1B1.13. Grant of this motion and confinement of Mr. Chmiel on home detention for 108 months—much longer than would be his effective sentence in a BOP facility—is an outcome that fairly considers the sentencing factors of 18 U.S.C. § 3553(a).

WHEREFORE, this Court should resentence Mr. Chmiel to time served, with an extension of supervised release for an additional 108 months with the condition that those 108 months be served on home confinement, and such other conditions as the Court considers appropriate.

[signature page to follow]

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ E. BART DANIEL
    E. Bart Daniel
    Federal Bar No. 403
    E-Mail: bart.daniel@nelsonmullins.com
    151 Meeting Street / Sixth Floor
    Post Office Box 1806 (29402-1806)
    Charleston, SC  29401-2239
    (843) 853-5200

*Counsel for Defendant Andrew*

Charleston, South Carolina

June 13, 2024