IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,　　　）　　Case No. _____

　　　　Plaintiff-Respondent,　　　　）　　(Crim. No. :19-CR-00299-JFA-1)

　　　　　　　　　　　　　　　　）
-vs-　　　　　　　　　　　　　　　）　　Hon. Joseph F. Anderson
　　　　　　　　　　　　　　　　）　　Senior United States District
　　　　　　　　　　　　　　　　）　　　　　　Judge
ANDREW A. CHMIEL,　　　　　　　）
　　　　　　　　　　　　　　　　）
　　　　Defendant-Petitioner.　　　　）

MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR
CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28
U.S.C. § 2255

I, Andrew Chmiel, Petitioner herein and Defendant in the underlying
criminal proceeding, proceeding *pro se*, herewith file this *Memorandum in
Support of Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C.
§ 2255* in the above-referenced matter.

1.　　**Statement of the Case:**　　I was named in 10-count *Indictment*
(Dkt. 3) handed up April 4, 2019, charged with one count of conspiracy to
defraud the United States (Count 1), three counts of mail fraud in violation of
18 U.S.C. §§ 1341 and 2 (Counts 2-4), two counts of healthcare fraud in
violation of 18 U.S.C. § 1347 (Counts 5-6), one count of violation of the Anti-
Kickback Statute in violation of 42 U.S.C. §§ 1320a-7b(2)(A) and (B) and 18
U.S.C. § 2 (Count 7), two counts of making a false statement to a government
agent in violation of 18 U.S.C. § 1001 (Counts 8 and 9), and one count of

- 1 -

conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). A criminal forfeiture count was included as well.[1]

2.     On November 1, 2019, I entered into a *Plea Agreement* (Dkt. 78, modified April 13, 2021). Pursuant to that *Plea Agreement,* I entered a plea of guilty to a one-count *Information* charging me with conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1347, that conspiracy being a violation of 18 U.S.C. § 1349. *Information,* Dkt. 97, filed April 8, 2021. The *Information* also included a forfeiture count. I entered the guilty plea on April 12, 2021. Dkt. 107.

3.     I was sentenced on March 19, 2024, to 108 months in prison, a supervised release term of three years, restitution of $98,935,533.00 and a special assessment of $100.00. *Minute Entry* (Dkt. 165); *Judgment in a Criminal Case* (Dkt. 173), entered March 20, 2024.

4.     Pursuant to the *Plea Agreement,* I agreed to criminal forfeiture of money and properties in the amount of $19,287,858.87. *Id.* at Attachment A; *Presentence Report* (Dkt. ---) at ¶ 44.  However, the *Preliminary Order of Forfeiture* (Dkt. 135), entered May 17, 2023, forfeited $10,733,165.25 in cash,

---

[1]     The *Indictment* also named 14 companies in which I held an interest as defendants in the conspiracy. *Id.*  Two of those – Pain Center, LLC, and DO Delivery – entered guilty pleas and were sentenced. Although I owned both of those companies (but Herb Kimble had an unrecorded 50% interest in them), my § 2255 *Motion* is only brought on my own behalf, not on behalf of either of those entities.

two parcels of real estate, two motor vehicles and an electric golf cart. Dkt. 135, entered May 17, 2023.

5. I did not appeal.

6. ***Statement of Facts:*** I participated in a scheme that purchased patient information and signed prescriptions for my durable medical equipment (DME) companies from entities controlled by Herb Kimble. The purchased patient information and prescriptions were used to send DME braces for back, wrists and knees to patients and then to bill Medicare for the items delivered to the patients.

7. Kimble's company would collect potential patient information from mass market advertising, offering patients who were on Medicare back braces for little or no cost. The patient would call an 800 number, answered in Kimble's Philippines-based call center, where his employees would collect information on the DME products the patient wanted to obtain and the patient information, including what was needed to bill Medicare for the DME to be provided. He would obtain prescriptions on behalf of the patients from medical professionals who did not have any face-to-face contact with the patient and were paid by Kimble for each prescription written.

8. Kimble would provide the completed patient package to DME supply companies like mine, charging generally $280 per product packet, a fee that the DME company could include in the bill to Medicare. Kimble explained that while the DME supplier was paying $280.00 for a completed product

- 3 -

packet, his company's invoice would reflect the fee as being for "marketing and processing" even though it was really a kickback to him for a complete referral package.

9. When a patient would call Kimble's 800 number, he or she would be screened to ensure Medicare eligibility to pay for a brace. The call would then be transferred to another employee, called a "chaser." The chaser would falsely identify himself or herself as an employee of the DME supplier. The chaser would try to "upsell" the caller, pitching them on buying multiple braces. Kimble had a term, "Ironman," to refer to his goal of selling a customer a brace for the back, two for the wrists and two for the knees.

10. When the total number of braces is consented to by the caller, the chaser would then encourage the caller to use one of Kimble's approved telemedicine medical professionals for the brace prescription. The telemedicine professionals were not essential: the caller could get a prescription from his or her primary care physician. However, the telemedicine professionals were preferred because they would respond with a signed prescription much more quickly and were much likelier to approve the prescription (given their financial incentive to deliver prescriptions calling for the DME.

11. After the signed prescription arrived at Kimble's company, it would be sent back to Kimble's billing department, which possessed access rights for each DME supplier's billing system. Kimble's billing people would input the data and upload the prescriptions and notes into the DME supplier's system as

a packet containing all the required documentation needed to fulfill the order and bill Medicare. After receiving the prepared packet, the DME supplier would confirm that the packet contained all the required documentation needed to bill Medicare, ship the DME equipment and submit a bill to Medicare.

12. My companies and the other DME suppliers would charge an hourly rate and a percentage (usually 7 to 10%) of money collected from Medicare for the items billed. The amount approved by Medicare was only a portion of what was billed. For example, my companies collected only about 46% of what was billed to Medicare for the DME provided to patients.

13. The only limit to how much the DME companies could sell to patients and bill Medicare was the number of patient packets bought from Kimble (at least up to the limit of how many leads his company developed).

14. Kimble maintained a hidden interest in several DME companies, including a 50% participation in the profits of DO Delivery and Pain Center LLC. He told me that if Medicare audited one company, it would stop paying all other companies in which any owner of the audited company had an interest until the audit was completed. By having an undisclosed interest, Kimble said, he ensured that his cash flow was maintained.

15. When I began working with Kimble, I met an attorney named Seth Lundy at the law firm King & Spaulding. Lundy had been retained because of his expertise in healthcare law, specifically the laws relating to doing business where Medicare was the payor. Lundy provided a lengthy opinion letter that

explained that if Kimble's company and the DME companies followed certain procedures – especially that the companies involved were not paying for the physicians' prescriptions ordering the braces for the patients, the program that Kimble was running and in which my companies participated was operating within the law.

16. I relied on the opinion. I knew that I was not buying prescriptions, and I did not believe that Kimble was doing so, either. Because he had been the original solicitor of the Lundy opinion and he freely touted it to others, I was confident that Kimble was operating within the guardrails the opinion set.

17. In December of 2016, I was in Hong Kong with Kimble to meet with the brace manufacturers. We were at a gym when he asked me how much money I wanted to make the next year. I pulled a figure out of the air – *I* believe it was $3 million – and he asked how many I needed per month, per week, per company to get there. I did the math in my head and told him, and he said something like OK, that's what you get then.

18. That was when I realized that there was a problem: Kimble could only suggest that the number of leads he could generate had no limit if he was controlling the prescriptions by buying orders from medical professionals.

19. That was when I should have walked away, but I did not.

20. The following August, I had just had joint replacement surgery. I was at home and still in substantial pain. Two FBI agents knocked on the door and told me they had questions. I spoke to them at great length about my

businesses, about which they already seemed well-informed. They provided a document demand which I believe was in the form of a grand jury subpoena, seeking records on Cumberland Medical, a company that Kimble and I owned 50/50.

21. After the interview, I contacted Mr. Lundy, who set up subsequent meetings with the agents. King & Spaulding oversaw a substantial amount of document production to the government over the next 18 months or so, and I participated in a number of meetings with investigators. Through all of this, Mr. Lundy assured me that we had nothing to worry about. He told us more than once that he had had a major role in writing the laws, and he understood them far better than the agents did.

22. Specifically, King & Spalding attorneys provided a proffer to the U.S. Attorney's Office (USAO) arguing that the actions of Cumberland Medical were compliant. Assistant U.S. Attorney Jim May later described it as not being a "well-received presentation. If I take a hundred step foot back, it appeared that, you know, they were driving the ship."

23. About a month or two after the interview, King & Spaulding suggested that I hire South Carolina counsel to help with the matter, because the investigation was being run from there and King & Spaulding had no South Carolina presence. I hired Edward Bart Daniel of the Charleston, South

Carolina, law firm Nelson Mullins. Once Mr. Daniel became involved, I immediately began cooperating with the USAO.[2]

24. Sometime during this period, Kimble changed counsel and began cooperating as well, although I was not aware of it at the time.

25. I did not know that the investigation was leading to MY indictment until I learned on April 9, 2019, that some of my partners in the DME companies were getting indicted and their homes raided. I contacted Mr. Daniels, who verified that I too was being indicted.

26. Mr. Daniels immediately began negotiating with the U.S. Attorney, and I was again sitting with government agents and USAO attorneys. We met for several days in a row (Mr. Daniels recalled for three days prior to arraignment on the fourth day). I appeared for an arraignment on April 18, 2019.

27. I began cooperating with the government in earnest. In late 2019, I was assigned a status as an FBI source in investigating a company in Mumbai, India, named PaddlePoint that operated the same way Kimble's call center worked. I started buying DME leads from PaddlePoint at the government's direction, using some of the DME equipment the government had seized from

---

[2] Mr. May told the court that the King & Spaulding lawyers "provided a presentation that was not very good that galvanized, you know, our approach to go forward with the case against Mr. Chmiel."

my company to fill the orders. I later began buying COVID supplies to assist with a government investigation.

28. I was prepared and called to testify in other cases, but my testimony was not needed.

29. My cooperation went on for four and a half years as a witness, an information source and an undercover operative. It ended when I was called to testify at the trial of Gorgi Naumovski in the Eastern District of New York. Mr. Daniel and I had been dealing with an experienced Dept of Justice lawyer named Andrew Cerensey. Surprisingly, Mr. Cerensey left the DOJ about 10 days before trial, with a new attorney – Miriam Glaser Dauermann – taking his place.

30. During the preparation session, Ms. Dauermann insisted that I testify that Kimble and I went to King & Spaulding with the intent to defraud and that we had agreed to (and did) say anything to King & Spaulding to get the. She demanded that I testify that we knew at the time our process was not compliant with the law, and we knew that we were defrauding the American people. She wanted me to say that I knew that attaining the letter was fraudulent and everything behind our business was fraudulent.

31. I told her that none of that was true. I believed at the time we obtained the letter that we were compliant, because I did not know until late 2016 that Kimble was buying prescriptions. However, Ms. Dauermann kept repeating, "Mr. Chmiel, this is your testimony. This is your sworn testimony."

Mr. Daniels told her, "Ma'am, that's not his testimony." She responded, "Well, this is what you said" and "This is what you said and it's different."

32. Mr. Daniels asked to review the FBI Form 302, but she declared that the government was not allowed to show it to me. Mr. Daniels said, "You are not allowed to let us review his own 302 in preparation for his testimony?" And she said, "Absolutely not."[3]

33. Mr. Daniels told this Court that Ms. Dauermann

stormed out of the room on two different occasions, one time for 15 to 20 minutes. And, finally, I went out and got her. When they came back in, Mr. Patrick Campbell, who Ms. Bower correctly points out, examined Mr. Chmiel at trial. But there was some real bitterness... Ms. Glaser Dauermann, there was some real bitterness toward the defendant, toward Mr. Chmiel and towards me based on that conversation, because she came back in the room, and she looked at us and she said, you need to remember -- very threatening -- you need to remember, I'm the who decides to file that 5K or not, remember that.
And I took it as very much a threat.

*Sent. Tr.* 33-34.

34. The Government conceded that I was truthful in my Naumovski testimony on direct and redirect examination. However, as recounted in the *Presentence Report,* the government argued that I lied in this exchange

---

[3] The first time Mr. Daniel was able to see the FBI-302 was when Assistant U.S. Attorney Bower told him after the Naumovski trial that they believed I had lied on the stand and that as a result, I would not be getting credit for substantial assistance to the government.

| Attorney: | And you believed, did you not, that the business practices were compliant, meaning they didn't violate the Anti-Kickback Statute, right? Chmiel: Correct. |
|---|---|
| Attorney: | And you believed that all of this was legal, correct? |
| Chmiel: | Correct, at the time. |
| Attorney: | And -- and -- and you've told the Government that, haven't you? |
| Chmiel: | I have. |
| Attorney: | You've told them that repeatedly? |
| Chmiel: | I have. |
| Attorney: | As a matter of fact, the night before your testimony, you met with the prosecutors and the agent here at the counsel table, and you told them that you believed all of this was compliant, correct? |
| Chmiel: | Correct. |
| Attorney: | And that you weren't aware that Kimble was not telling Lundy the truth, right? |
| Chmiel: | Correct. |

*Presentence Report* at ¶ 49. This exchange was cited as well:

| Attorney: | You told them there was no reason to mask anything, right? |
|---|---|
| Chmiel: | Correct. |
| Attorney: | And that's because it was your intention, and throughout your dealings there was -- as far as you know, there was no violation of the Anti-Kickback Statute, correct? |
| Chmiel: | Correct. |
| Attorney: | And was that your understanding and how you expressed it to Mr. Naumovski, there was never any discussion about anything illegal happening at Life Source Medical, is that right, sir? |
| Chmiel: | That's correct. |
| Attorney: | You understood the legal opinion to be the legal opinion, right? |
| Chmiel: | Correct. |
| Attorney: | And you never told Mr. Naumovski anything that differentiated from that legal opinion, correct? |
| Chmiel: | Correct. |
| Attorney: | At all times during your dealings with Life Source Medical and Mr. Naumovski's dealings with Life |

> Source Medical, it was your understanding, and his
> shared understanding, that everything was compliant?

Chmiel: I believed everything was compliant, correct.

35. What the cross-examination does not reveal is that I became a partner with Mr. Naumovski in about April 2016. *See* Naumovski *Indictment,* Case No. 1:20-cr-00384, EDNY, at Dkt. 1. I figured out that Kimble was buying prescriptions after we talked in Hong Kong, nine months *after* Mr. Naumovski and I began to work together on Life Source. All of my responses were accurate as to the founding and initial months of Life Source. I was wrong to answer that "[a]t all times during your dealings with Life Source Medical and Mr. Naumovski's dealings with Life Source Medical, it was your understanding, and his shared understanding, that everything was compliant?" However, I had been answering questions about the masking and what I told Mr. Naumovski when we got involved on Life Source, and I overlooked the "[a]t all times" qualifier on that question.

36. The government's most egregious complaint was that I lied when I responded "no" to the question, "Do you believe the defendant committed a crime?" First, such a question is grossly improper to ask a lay witness. I could testify to what I knew to be factual, but whether those facts stack up to a crime is a question for the jury. Second, I had truthfully testified that I had never discussed with Mr. Naumovski my conclusion that Kimble was buying prescriptions and thus violating the Anti-Kickback Statute. Thus, I had no idea that he believed or had reason to believe that he was part of a conspiracy

to break the law. I think that his belief would be what made his involvement a crime. My answer was an honest one.[4]

37. When Ms. Dauermann demanded that I testify falsely and refused to show me the FBI agent's perception of my prior statements, I would have refused to testify unless she relented. I at least would have demanded that the matter be presented to the court had Mr. Daniel counseled me that I should do so. Facing the prospect of perjuring myself by saying something I did not believe was true versus testifying truthfully only to have the government accuse me of obstruction and perjury, I would have considered taking the 5th Amendment and forcing the Eastern District to sort it out.

38. Mr. Daniel argued at sentencing that at the Naumovski trial,

Mr. Chmiel was consistent. And I was there for the first debriefing and I was there for every debriefing since. Mr. Chmiel has been consistent. He said that when they went to King & Spalding for that opinion letter, he said --specifically, he said: Mr. Kimble knew things I didn't know. I had just been in the business.

And he had been in the business for a while. But he said Mr. Kimble made representations to the lawyer for King & Spalding, Mr. Seth Lundy. And Mr. Lundy took those representations. He said: I was here. I was still working. I didn't know. He said: I know this, we had never bought any doctors' orders. I know that. And he was talking about himself. But what he didn't know at that time back then is her, Kimble, was buying the doctors' orders. Now, Chmiel finds out later when he has this great epiphany in Hong Kong at a trade show, I think. He's in the gym with Mr.

---

[4] The Government relied on -302s of representations made by Kimble in arguing that I had lied. *See Sent.Tr.* 26. As the Court knows, Kimble is a fugitive, having falsely said he would appear for sentencing on several occasions. In retrospect, nothing he is said to have said in an unsworn statement shifting blame onto others should be assigned any reliability.

Kimble and then Mr. Kimble asked him some question. And then that's when Mr. Chmiel told the FBI and the U.S. Attorney's Office, and I was right there, that that's when the light went on and he realized, we're buying doctors' orders, you know, that I am not, but he is. Because Kimble said something to the effect of, well, the more we do, you know, the more leads, basically, I will sit and give you is the more money you could make. So that's the explanation for that.

So what happened here, Your Honor, is -- I believe what happened is this, I believe it was a mistake. It was a misunderstanding early on when Mr. Chmiel was debriefed by the FBI, the first debriefing. And we've got all these people in the room, Mr. Chmiel and myself. I didn't have anything else with me because we sort of dropped everything. I didn't have a chance to get anybody. We went back up to Columbia early the next morning. I think we even left at 7 in the morning and started debriefing and debriefed, I think, one of the government papers says some 36 hours. The next three days we debriefed. And then the fourth day, which is a Friday, is when we had the arraignment over at the courthouse.

I believe what happened is, they misunderstood Mr. Chmiel at that first meeting. And agent -- Agent Neil Powell put the 302 that he knew when they went to see Mr. Seth Lundy, King & Spalding, that what they were telling him was really not true. And that's not what Mr. Chmiel said. If we ever seen that 302, we could have corrected that a long, long time ago.

And, Your Honor, even when we had the property division, they let Mr. Chmiel keep some of his property. And the property that they let him keep was that property which was acquired a certain date in 2016, because that's when the Hong Kong, in the gym, at the trade show meeting between Kimble and Chmiel, and that's when the light went off. And he had run what he thought was a legitimate business. And he was making some money. And he wasn't making the kind of money that he later made towards the end when, unbeknownst to Mr. Chmiel, Mr. Kimble got out of the companies, gave him -- gave Chmiel all the profits in the last year or 18 months while he was secretly cooperating, which greatly inflated everything that -- his entire involvement, really. I am not excusing him. He accepted the money and spent some of the money.

*Sent.Tr.* 37.

39.     The Government argued at sentencing that I pled guilty, admitting to the Government's recitation of facts at the change-of-plea hearing. *Sent.Tr.*

35. That is true, but nothing in the plea colloquy – which the Court recognized alleged a conspiracy from 2016 until April 2019 – is inconsistent with what I said all along, that I did not reasonably suspect until December 2016 that Kimble was violating the law. When I did, I should have stopped dealing with him and reported it. Instead, I continued to profit from it, and I have always admitted as much.

40. However, the Government is not entitled to make more of it than is actually there.

41. ***Legal Basis for Motion:*** Title 28, § 2255, permits *habeas corpus* relief for an error of law or fact constituting a constitutional error or a "fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Mikalajunas*, 186 F.3d 490, 496 (4th Cir. 1999) *citing United States v. Addonizio*, 442 U.S. 178, 185 (1979), or is "inconsistent with the rudimentary demands of fair procedure," *United States v. Timmreck*, 441 U.S. 780, 784 (1979). If the court finds that the sentence was not authorized by law, was unconstitutional, or otherwise open to collateral attack, it must vacate the judgment, resentence the prisoner, or grant the prisoner a new trial as appropriate. *See* 28 U.S.C. § 2255(b).

42. Under § 2255(b), unless the pleadings, files, and records conclusively show that the prisoner is not entitled to relief, the district court shall hold an evidentiary hearing. *United States v. Witherspoon*, 231 F.3d 923, 925–27 (4th Cir. 2000). Whether an evidentiary hearing is necessary is

generally left to the sound discretion of the district judge, but this Circuit long ago recognized that there is "a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court." *Raines v. United States,* 423 F.2d 526, 530 (4th Cir. 1970). An incarcerated movant's *pro se* pleading is to be liberally construed. *See Erickson v. Pardus,* 551 U.S. 89, 94, 1 (2007) (*per curiam*); *In re Williams,* 330 F.3d 277, 283 (4th Cir. 2003).

43. A district court has discretion whether to order a hearing when a defendant brings a motion to vacate sentence pursuant to 28 U.S.C. § 2255. However, the law imposes limitations on the exercise of that discretion. In considering a motion to vacate a defendant's sentence, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3rd Cir. 1989); *see also* § 2255 *Rule* 4(b). As noted, a district court must hold an evidentiary hearing "unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Witherspoon, supra.*

44. The standard for requiring a hearing on a § 2255 motion is intended to be a "reasonably low threshold for habeas petitioners to meet." *United States v. McCoy,* 410 F.3d 124, 134 (3rd Cir. 2005), *quoting Phillips v. Woodford,* 267 F.3d 966, 973 (9th Cir. 2001). A district court abuses its discretion if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief. *Id.* at 410 F.3d 131 and 134 ("If [the] petition alleges any facts warranting relief

under § 2255 that are not clearly resolved by the record, the District Court [is] obligated to follow the statutory mandate to hold an evidentiary hearing").

45. "The right to counsel is the right to the effective assistance of counsel'." *Strickland v. Washington,* 466 U.S. 668, 686 (1984), *quoting McMann v. Richardson,* 397 U.S. 759, 771, n.14 (1970)). Counsel is ineffective when his "conduct so under-mined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland, supra* at 466 U.S. 686.

46. To determine whether Defense Counsel was constitutionally ineffective within the meaning of the Sixth Amendment, the Court must apply the two-prong standard adopted in *Strickland, supra,* and its progeny. That standard holds that a § 2255 movant shows that his representation was constitution-ally inadequate by demonstrating (1) that his attorney's performance was deficient, that is, unreasonable under prevailing professional standards; and (2) that he was prejudiced by the attorney's performance. *Forte, supra* at 865 F.2d 62 (*citing Strickland, supra* at 466 U.S. 687, 694).

47. Under the first *Strickland* prong, "judicial scrutiny [of counsel's performance] is highly deferential," and courts "must indulge [in] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 466 U.S. 688-89; *see also Yarborough v. Johnson,* 520 F.3d 329, 337-38 (4th Cir. 2008), *quoting Strickland, supra* at 466 U.S. 689. This deference is afforded because "counsel is strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland, supra* at 466 U.S. 690.

48. Of course, there is a dynamic here between counsel and client. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 466 U.S. 691. With respect to counsel's duty to investigate, what investigation decisions are reasonable depends critically on information supplied by the defendant. For example, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Elmore v. Ozmint*, 661 F.3d 783, 857 (4th Cir. 2011), *citing Strickland, supra.* Thus, the "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Id.*

49. In order to establish prejudice, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra* at 466 U.S. 694. As defined by the Supreme Court, "[a] reasonable probability is

a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Making this determination requires the court deciding the ineffectiveness claim to

> consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Elmore, supra* at 661 F.3d 858, *quoting Strickland, supra* at 466 U.S. 695-96.

50.     *Strickland* holds that "[t]aking the unaffected findings as a given[] and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.

51.     Generally, courts consider the *Strickland* prejudice prong before examining the performance of counsel prong "because this course of action is less burdensome to defense counsel." *McCoy, supra* at 410 F.3d at 132 n.6; *see also Strickland, supra* at 466 U.S. 694 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so," the prejudice prong should be examined before the

performance prong "to ensure that ineffectiveness claims do not become so burdensome to defense counsel that the entire criminal justice system suffers as a result"); *see also Elmore, supra* at 661 F.3d 874, *citing Fields v. Attorney General,* 956 F.2d 1290, 1297 (4th Cir. 1992.[5]

52.     Thus, to merit a hearing, a claim for ineffective assistance of counsel – with the court accepting as it is required to the veracity of the petition's allegations – must satisfy both prongs of the *Strickland* test, deficient counsel and prejudice to the defense.

### Counsel rendered ineffective assistance in four material respects

53.     Defense Counsel performed admirably throughout much of the proceeding. However, even the best attorneys can err, and Defense Counsel did so in representing me in the Naumovski trial matter and at sentencing, making mistakes at four crucial points.

---

[5]     Sometimes, the practical suggestion to first consider the *Strickland* prejudice prong helps inform the inquiry into the performance of the movant's trial counsel. *See, e.g., United States v. Booth,* 432 F.3d 542, 546 n.4 (3rd Cir. 2005).

54.  ***Advice Prior to Naumovski Testimony:***  A defense attorney "'must give the client the benefit of counsel's professional advice on this crucial decision' of whether to plead guilty. *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir. 1996) (quoting Anthony G. Amsterdam, *Trial Manual 5 for the Defense of Criminal Cases* (1988); *see also Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999) ("*Boria* recognizes a lawyer's general duty to advise a defendant concerning acceptance of a plea bargain"); MODEL RULES OF PROFESSIONAL CONDUCT RULE 1.4(b) (1995) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"). As part of this advice, counsel must communicate to the defendant the terms of the plea offer, *see Cullen*, 194 F.3d at 404, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed. *Ortega v. United States*, No. 4:17-cv-00529-BLW (D. Idaho Sep. 1, 2023), 2023 U.S. Dist. LEXIS 155976, at *17 citing *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000). *See also Jones v. Murray*, 947 F.2d 1106, 1110-11 (4th Cir. 1991) (interpreting STANDARDS FOR CRIMINAL JUSTICE 14-3.2(b) (2d ed. 1986 Supp.).

55.  Counsel had an obligation to advise me that if the government deemed me to be testifying falsely in the Naumovski trial, I was at jeopardy of not just losing any possible USSG 5K1.1 benefit, but I could be held under § 3C1.1 of the Guidelines to have obstructed justice (adding two levels to my Total Offense Level and denying me a three-level reduction under § 3E1.1 of the

Guidelines). This is not simply counsel telling me that I should be truthful. I endeavored at all times to be truthful. Rather, had counsel explained that if the government believed that I was lying – which Ms. Dauermann obviously believed I was – and if it persisted in its nonsensical refusal to let me see what its FBI agents believed that I had said – I could have pursued several options. One would have been to demand that I be given access to my -302 as a condition of testifying. To do so would not have made it *Jencks Act* material discoverable by the defense (if that was the government's fear). *See United States v. Kot*, Case No. 2:10-CR-00280 (D. Nev. May 10, 2012), 2012 U.S. Dist. LEXIS 65442, at *3 (collecting cases from the Circuits on discoverability of -302s). I could have declined to testify and directed counsel to immediately make a record before this Court of my reason for not doing so. Such a decision would not have affected my acceptance of responsibility points or caused me to be liable to a Guidelines obstruction of justice enhancement.

56.     This Court observed to counsel during sentencing that he had an obligation to prepare me to testify (as well as did the government). *Sent.Tr.* 33. That obligation would not have extended to preparing me to help the government make its case against Naumovski, but it would have extended to minimizing the risk that the government would subsequently accuse me of obstructing justice and testifying falsely. Counsel had an obligation to me to prepare me to testify to the extent that my truthful testimony would not be contrary to my interests.

57.     Had he done so, it is reasonably probable that I would have resolved any inconsistencies in my testimony resulting from misunderstanding or lack of recall of what I said six years previously to FBI agents or four and a half years before in debriefing, and I would not have been found to have testified falsely.

58.     **Sentencing:**     Counsel had a professional obligation to withdraw from representing me at sentencing in favor of testifying as a fact witness as to my testimony at the Naumovski trial and prior statements.  Rule 3.07(a) of the South Carolina Rules of Professional Conduct requires counsel to step aside as an advocate where he is a necessary witness on a contested matter. Counsel was a witness to what I pled guilty to, to what happened in New York during the Naumovski trial preparation, and – most critically – to what I had told agents and the USAO in prior debriefings. While he stated his observations in argument, it is settled that "arguments by counsel can't be relied on as evidence if they are not based on facts in the record." *United States v. Junkins*, 860 Fed.Appx 297, 304 (4th Cir. 2021), citing *United States v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998).

59.     The government was required to prove that I had obstructed justice by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002). Had counsel testified as to those matters on which he merely argued, there is a reasonable likelihood that the government would have failed and that I would have had a Total Offense Level that was five levels lower.

At the same time, my extraordinary record of four years of cooperation would reasonably have resulted in a government motion under USSG § 5K1.1.

60.     Finally, even had he not testified, counsel had a professional obligation to investigate and advocate against the Probation Officer's and government's claim that I obstructed justice and should be denied credit for acceptance of responsibility. Adequate investigation would have revealed that my answers on cross-examination at the Naumovski trial were not false but rather proper in the context of the time period about which I testified and that I was improperly denied access to my prior statements by the government. Counsel would have raised those matters in the sentencing memorandum and not have been foreclosed from arguing them at the sentencing hearing.

61.     **Conclusion:**     Counsel skillfully guided me through much of the long and arduous process of cooperation. Unfortunately, at the very end – in the Naumovski matter and at sentencing – Defense Counsel made errors that fell beneath the standard expected of defense counsel. As a result, I had a Total Offense Level and advisory sentencing range that was substantially above what it properly should have been, and my resulting sentence was grossly disproportionate to those applied to co-defendants (and to have been applied to Herb Kimble, who destroyed his credibility by electing to become a fugitive rather than accepting a likely sentence of probation).

WHEREFORE, this § 2255 *Motion* should be granted and my sentence

vacated.  The statements of fact made herein are true, under penalty of perjury.

Executed March 31, 2025

Andrew Chmiel
Reg. No. 34305-171
FCI Beckley Satellite Camp
P.O. Box 350
General & Legal Mail
Beaver, WV   25813